Due to weather and travel difficulties, we have only one case to be argued today, and that is Sharon Afshani v. Spirit SPE Portfolio et al. We'll call that case and hear from Michael W. Vivoli first. Do I have the right lawyers in the courtroom? Mr. Vivoli. Good afternoon, your honor. It's actually Michael Vivoli. May it please the court, counsel, honorable justices of this court of appeal, it is a pleasure and a privilege to be before you here today. I do want to apologize to the extent I delayed the court at all. I want to ensure you, I flew out yesterday thinking I'd get here with plenty of time. Thought I would have plenty of time this morning to sit in a hotel room and get ready for this, and I ended up sketching most of my notes out on a notepad and fortunately had the time to type up some notes, but it is a privilege to be before you. This case obviously was disposed of on the pleadings. It is and was primarily a case of fraud by non-disclosure, that is the failure to disclose facts. That was going to be my first question because I know Judge Starr said, well, he wasn't really sure exactly what theory of fraud. I read your brief and correct me if I'm wrong, is relying on a fraud by non-disclosure theory. That is correct. Okay, so that's the theory. There is, well, and I should also point out there is also affirmative misrepresentations because there was both a failure to disclose known facts, the known fact being that this tenant was headed for bankruptcy, which by all accounts is a material fact to any buyer of commercial property, income producing property such as this. So we have the non-disclosure of a false, namely that the tenant was a very strong tenant, that it was vertically integrated, basically propping up all of the reasons why my client should perceive that it was, in fact, a good tenant. So I guess, are you saying that you're relying on two fraud theories, distinct fraud theories, not just fraud by non-disclosure, which has its own set of elements? I do believe that it's supported by both, to be clear, and I believe that we have asserted the elements for each. Okay, so fraud by non-disclosure and then just a fraud. I don't know if that's a common law fraud or the second one. What is the second one you're relying on? Fraudulent misrepresentations designed to deceive my client into misperceiving facts. Okay. And again, I do want to point out, particularly from the non-disclosure standpoint, these were facts that we have alleged were known peculiarly by the appellees in this case, the sellers. The sellers were not only the landlord, they also had a lending relationship with the tenant that was not disclosed to my client, and by virtue of which, they were receiving non-public information about their financial condition, information that my client could not possibly have publicly discovered anywhere. That was not disclosed to my client. Instead, they make these half-truth affirmative misrepresentations of fact to my client. I don't want to just go through what was alleged in the pleadings. The pleadings were very voluminous. I do, though, want to address an accusation that the appellant has, in some fashion, I think the word was lambasted the district court. There has been a suggestion that the appellant ignored the district court's prior identification of deficiencies in the pleading, and I wanted to go back and reread the court's order, which is at ROA 404. The court cast the who, where, and when questions that the court wished to see addressed in the third amended complaint far differently than the discussion that later ensued on the motion to dismiss. The court cast the who as who from defendants made the misrepresentations or concealed facts. Well, we've alleged that was Travis Carter, the individual that my client dealt with. So this is something I was going to ask you. So obviously 9b applies here, Federal Rule of Civil Procedure 9b, and we all know that requires some greater specificity in your allegations, and we have that case that says who, what, when, all that stuff. So I was just going to ask you, if you could, just to go through the who, what, when parts and just say, look, in our complaint, we allege that here, because I think we need to have that just under our precedence. And you were on who? I'm sorry? You were on who? Oh, yes. The who, sorry, was Travis Carter, the individual with whom my client communicated directly. There's email correspondence corroborating that fact, acknowledged it's a later series of email correspondence, but we did on behalf of the defendants that we were dealing with. I mean, that's basically who you're saying made the, either the misrepresentation or didn't disclose what was needed to be disclosed. Correct. And the where, again, Carter. Okay. Yes. The court in its first order, the where, the question that was posed was where defendants should have disclosed the facts to my client. We specifically allege that ROA 425 through 426, which are paragraphs 37 and 38 of the third amended complaint, it should have been disclosed in the contracts and or by the very disclosure that the appellees did not provide until later in the year, in December of 2018, when they actually do disclose, hey, we've not made any representations to you about the strength of the tenant. We don't owe you anything about the strength of the tenant. You are disclaiming anything about the strength of the tenant. Buyer is hereby closing escrow based on its own investigation. That's a disclaimer. That disclaimer didn't appear until December of 2018. The third amended complaint alleged that it should have been made between June and July 27th of 2018. That's why that particular timeframe, June to July, because we had two open escrows on the purchase of these properties. And it's obviously when you're dealing with a purchase and sale of real property, the disclosure is supposed to be made before the close of escrow. No such disclosure was made during the time frame. Okay. See, I guess I had a different understanding about where, but that doesn't necessarily mean anything. In a fraud case, normally I would think if you're saying fraud, the where is, in this circumstance, you said something that misled me or that created a duty to divulge more information. Where, and I know you allege that Carter said certain things. In your view, where in the complaint do you specifically allege that? What was said and when was it said? Yeah, there are multiple allegations, but there's one in particular, and it's between June and July 27th of 2018 that those representations were made. Admittedly, the third amended complaint doesn't go through and specifically allege a phone conversation, but again, that's sort of my point. The district court charges with a different series of who, where, when. We provided that information. The court came back with a new set of inquiry that frankly we could answer. I get that. I don't want you to run out of time, but what about the what? I guess that's very important to me because if we're talking about non-disclosure, one of the elements of fraud by non-disclosure is there was a duty to disclose material facts, and part of that duty would arise if there were a partial disclosure that created a false impression, which is I take it what you're arguing, that he said certain things and that caused a duty to give more information. So what, where do you allege what exactly he said that created that duty? What he said was a very strong tenant, vertically integrated. He made specific representations about, I believe it was their optical department, that their revenues, they had phenomenal revenues, I believe was the actual saying. The detail of when those statements were made frankly would have to be ferreted out through discovery. Presumably there's phone records, and that's why again in response to the arguments that we received on the... But where in your complaint do you allege, I mean you allege what he said? Yes. Okay. There's, vertically integrated is one of them, and I apologize, I don't have the complete record, but vertically integrated, a very strong tenant that could be counted on to pay rent well into the future, and... So it's your point that if they said something, they needed to say the whole thing, or is it, what if they said nothing about the tenant? If they said nothing about the tenant, they might have a stronger argument of an insufficient showing of fraud or non-disclosure, but when you take into account known material facts about a tenant that they know is headed for bankruptcy, again because of their inside information, they not only don't tell us that until they suspect later in the year that we're maybe onto that, and they're concerned that maybe we now have suspected or learned that, they then come out with this new disclosure saying all of the things that I previously alluded to. None of that took place. Instead, they point my client to all of the factual representations about vertical integration, a very strong tenant, the fact that they were retaining a large part of the ShopCo portfolio, that in itself is a representation that they are evaluating. I understand that. One of the elements of fraud by non-disclosure under Texas law is the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them. Could you tell me why you did not have your client, who's presumably a sophisticated businessman, who's entering, as you say, who's entering into purchase agreements where the viability of the lessee is crucial. Why didn't your client have an equal opportunity to discover facts about the tenant? That is covered based upon the specific allegations that the defendants had unique and particular knowledge. They had access to non-public facts, the non-public fact being the financial difficulties of this tenant. They knew about that. My client didn't. It's alleged in the complaint that my client had no idea about it. Right, but I'm talking about why didn't he have an equal opportunity to discover facts about ShopCo's precarious financial situation? Because, again, it's non-public information. They had sole access to that information and didn't disclose it. Why did they have sole access? Because they had a special relationship by virtue of being the lender, as a lender to this tenant. They were not just the landlord, where maybe there's some late payments and you might surmise, hey, maybe there's something going on. They had made a $35 million loan and were receiving non-public information about this. Did they disclose that though? No, they did not disclose it. They didn't disclose the loan at all? No, I don't believe they did. I haven't seen it anywhere. Okay, I'm sorry. That's very important part of this case. Couldn't you have inquired with, couldn't there have been an inquiry by your client about, hey, what about ShopCo? I mean, okay, you say these things about ShopCo. I understand you allege they say these things. I get it, but why couldn't there then be an inquiry by your client to say, look, I need some more information. I need to drill down into this. It's very difficult to get an inquiry on the part of my client because he was not provided with knowledge that would have triggered him to ask further or to investigate further. Furthermore, we've pointed out the fact that in both of the contracts, the defendants put in a provision that we could not contact without their prior consent of the landlord. That's true. But again, there's no reason. No, it doesn't block you from doing it, right? It says you need their permission. It precluded us from going and contacting the tenant without first notifying and getting the consent of the seller. Again, on a very short timeframe, this escrow was, I think, a four to five week escrow, not a whole lot of time, and more importantly, nothing that put my client to a duty of inquiry. In fact, quite the contrary. You have affirmative factual representations that there's a very strong financial history there. Are we dealing with the contract claims? We took to heart the district court's comments about distinguishing between tort and contract theories of liability and gave that a lot of thought before filing a third amended complaint. The third amended complaint asserted a contractual theory of recovery based upon unilateral mistake induced by the seller. That is a valid contractual theory of recovery. That is the theory of recovery that we asserted. We asserted the elements required for that. The claim was entirely valid and should not have been dismissed. Okay. Okay. So that is part of this and that is not subject to the... It's not subject to the heightened pleading standards. Absolutely. Do you agree that the common law fraud is subject to the fraudulent misrepresentation or both? All of the fraud? I'm not going to tell the court that a fraud claim is not always subject to rule B in some respect. It is. But there is in the benchmark case, there's a relaxed standard whereas here, you point out that the defendant has unique knowledge or superior knowledge. That's this case. And that's why, again, in the benchmark case, the allegations of when the fraud was made was similar to this. In fact, I think their time period was even broader than is alleged in our complaint. So for all those reasons, I respectfully submit that the district court just purely erred, particularly with regard to not allowing us a chance to amend. This was, in fact, the first time we amended in response to the district court's order, pointing out deficiencies. And again, the deficiencies that the district court pointed out, we did address, only to find ourselves in a different argument about different facts that they allege we should have asserted, that frankly we probably could, but it would entail doing nothing more than piling through phone records to find out when specific conversations took place, all information that's completely within their control. The reason for Rule 9 is to put the defendant on notice, to give them notice of what they're being accused of. That was amply satisfied here. Unless there's any other questions. I don't have any. Thank you. Thank you very much. Good afternoon. May I proceed? Thank you, Your Honor. Jose Valdez on behalf of Appalachia SBA and SMTA and may it please the court. The district court was right to dismiss the Third Amendment complaint based on the allegations that were set forth therein, Your Honors. You just heard Appalachia's latest formulation and repackaging of those allegations, but the court should look to the Third Amendment complaint so it could see how or what exactly was before the district court when it dismissed it with prejudice. The court will see that while the theory of fraud that Appalachia is trying to assert is unclear, whether affirmative fraud or fraudulent concealment, the crux of his fraud claim, Your Honors, is that when he purchased the properties, the Appalachians purportedly knew that the tenant, Shopko, was going to go bankrupt and that he was in a bad financial state and that the Appalachians' failure to disclose that fact is essentially fraud. That's essentially what it comes down to. Yes, the only thing I'd add to that as I try to understand the theory is that because of what Carter said, which is they're going to pay on time, they're going to pay through a certain date, certain departments are doing very well, I take it that the argument is that that created a duty in order to make a fuller disclosure about the financial situation of Shopko. Is that your understanding of the claim? Your Honor, that is my understanding of the claim as he just set it forth right now, but that presumes, Your Honor, that the Appalachians and Mr. Carter actually knew that Shopko was in a bad financial situation and that it was going to go bankrupt. And I think it's important for the court to take a look at the specific... But the fact that it made a huge loan is one, and that whether or not, we don't know if the loan was being service paid on or not, do we? That's exactly right, Judge O'Rourke. I don't have a way of knowing that. Your client does, and that's why they need to, they can allege that and get discovery that indeed y'all, that you, they weren't paying the loan. Were they paying the loan? So, Your Honor, as far as I know the facts, they were paying the loan, but more importantly, the plaintiff does not assert that they failed to issue the loan. And I think that's an important... Failed to make payments under the loan. They don't have that information. It's uniquely in your client's purview and is confidential. Well, that's according to his version of the facts, Your Honor, but I think... Which is what we have to take in looking at this case on the pleadings. Of course, Your Honor. We have to take all of his version of the facts. You have to win on his version of the facts. Indeed, indeed, Your Honor. And if I just may direct the court to the allegations that... I mean, I wish you'd do that because I got to tell you, after reading Judge Starr's opinion, I thought, okay, lack of specificity. I looked at our cases on lack of specificity. Then I looked at the complaint and the complaint does specify a number of things. I mean, it tells a story that I can understand with respect to what was going on, who made certain representations. You know, so I understand the story. So if you could... I guess part of your argument, I understand, is the specificity argument under Rule 9. Okay, I get that. You can make that argument with respect to the complaint and explain to me why the complaint is lacking in specificity, but I do want to make sure you get to the alternative argument that you're making, which is even if we get past the 9 problem, the Rule 9 problem, that there is a failure in this theory of fraud for some legal reason, you know, because you make an alternative argument. Indeed, Your Honor. Okay, so that's fine. So go ahead with your argument. So I just want to just, again, clarify for the court that really his theory of fraud depends on Viapolese and Mr. Carter specifically knowing about Shopkill's bad financial condition and impending bankruptcy. And he... Knowing. Okay, fine. Doesn't Rule 9 say knowledge can be pled generally? Knowledge can be pled generally, but in this case, Your Honor, knowledge of the falsity needs to be backed or needs to be supported by an allegation that suggests that when the allegations were made, the misrepresentations, sorry, they were false or made false or made recklessly. And I think if we look at paragraph 10 of his amendment complaint... I've got it right here, paragraph 10. So, and this is the allegation that he highlights on page 28 of his brief. This is the allegation that he essentially argues, establishes that Mr. Carter knew at the time of the transaction that Shopkill was going to go bankrupt. He says right here, in particular, SRC and its officers and directors had non-public inside information about Shopkill because the defendants had loaned $35 million to Shopkill. Your Honor, the district court found that that was concussory, and that is true. I don't understand that, frankly. It's a fact. It's like saying, hey, look, here's my allegation. My accusation is you loaned a bunch of money to these people, and so you had good reason to know that they were in a bad financial situation. I mean, how is that conclusory? Your Honor, just because a defendant here, he doesn't identify which one or which entity specifically, issued a loan to Shopkill, that doesn't mean that they were receiving up-to-date, you know, detailed financial information during the life of the loan, such that they could, that Mr. Carter actually had any idea of what their actual financial Well, when did Shopkill, Shopkill went bankrupt? Junko did go bankrupt, Your Honor. And how, when did Shopkill go bankrupt? In January of 2019, Your Honor, I believe. And when was this allegation made, with respect to you loaned Shopko $35 million? This is the date of the complaint, huh? So he doesn't identify specifically when this allegation was made, but presumably, under his presentation of the facts, it was during the seventh month period, from June to December, that Judge Starr found was not particular enough under Rule 9b. But I think what's important here is that there is no allegation of Shopko ever disclosing its financial information to SPE, SMTA, the lender, whichever it may have been, and how that information trickled down to Mr. Carter. It's conclusory. There is no allegation showing that Mr. Carter knew that when he was discussing these loans that... But you don't make a loan of that amount without getting financial information from the borrower. Indeed, Your Honor. They would have had some information about the financial status of the borrower before they would have loaned $35 million. Absolutely agree, Your Honor. But based on the allegation that they simply issued a loan of $35 million without specifying even when that was made, we just know it was at some point before the transaction. Well, they have to do discovery to figure out when the loan was made and what the documents were that were given to induce the loan. They get to explore the loan before, to see if they can make their case, whether Carter, whether he knew, was he part of that? Did he have access to those documents? Did he personally requested those documents? Because he's very much involved in this. All of that is relevant to whether he had the information of the true financial condition of the entity that went bankrupt. And when he knew that versus when he was making these other puffery statements about how great they were, is very pertinent to whether he was committing fraud on behalf of that entity. I'm not saying personally. Yes, Your Honor. But he fails to allege how Mr. Carter obtained that information. He doesn't even allege that Mr. Carter was participating when that loan was issued. And more to the point, Your Honor, based on the general allegation that a defendant issued a $35 million loan, the reasonable inference that one can draw is that at the time of the loan, whichever entity made that loan thought that SHOPCO was, in fact, creditworthy. Because as you— The managing agent of all of those entities. So you're saying he wasn't the SRC and the SPE and the SMTA? Wasn't—that's what it says, that he was the vice president and managing agent of SRC and those other entities. So he didn't have that information? That's in the complaint. It's in the complaint that he was an officer of all these entities, Your Honor. But it doesn't go to—the allegations in the complaint don't indicate that he participated in issuing that loan. That is nowhere to be found in the Third Amendment complaint. One would have to— With a fair inference, if he is the managing agent of the entire relationship with each of those companies, that he knows their financial situation and what's going on. I mean, that's a huge—that was a— In other words, yeah, in other words, I could imagine that being proved up after discovery. Maybe not. Maybe there is no ultimate proof of that, but maybe there would be, right? Potentially, Your Honor, but— Potentially, then why can't you get past Rule 9? Because at the pleading stage, Your Honor, it is plaintiff's burden to establish as an—to establish and plead a plausible knowledge of the falsity of the statements that were made. And in this case, just based on the fact that some defendant issued the loan, he was essentially asking the district court to assume that just because the loan was issued, that Mr. Carter was receiving all this information that would have shown to him clearly that he was going to go bankrupt. I don't want to cut your argument off, although I just cut you off there. Do you have any other arguments on that vein? Where—because it's helpful to me to say, okay, paragraph 10 shows a failure on 9b. If you have any more on that, great. But as I said earlier, it would be helpful to also know what your alternative argument is. Assume that 9b is satisfied here by the allegations. I think you're making alternative arguments about why we should affirm. Indeed, Your Honor, and there are several of those under both theory of fraud by, you know, concealment and affirmative fraud. Okay, we'll talk about fraud by nondisclosure, because I thought that was the one that was more clearly laid out in the brief. Indeed, Your Honor. Okay, so under Texas law, he asked a plausible plea, as you mentioned earlier, Judge Duncan, that he did not have an equal opportunity to discover the information that was reportedly omitted. Now, Appellant refers to Section 2.07 of the contract, which, as you mentioned, only prohibited him from contacting CHAMCO without their written consent. There's no allegation in the entire complaint where he says that he requested SP and SMTA's consent, let alone that they rejected it. So he's asserting in conglomerate fashion that they did not have access to that information based on a contract provision that clearly shows that he could have asked for permission. He never did. And he goes beyond that, Your Honors. He says that they took active steps to conceal that information, and beyond that contractual provision, I did not see any single affirmative act that Mr. Carter took or anybody at any of the appellees took to prevent him from finding that information. So that would be, as I understand the structure of your argument, that would be alternative to, let's say we don't agree with the 9b conclusion, this would be an alternative basis for affirming. Indeed, under 12b-6, Your Honor. Okay, what else do you have on the alternative? For fraudulent concealment or for— Whatever you think is the strongest. So first, as to the material misrepresentations that he's asserted, he offered a few of them. That SHOPCO was a valuable tenant that is too general without any specific detailed financial information for a reasonable person to ascribe importance to it. He also asserted that SHOPCO was—he was told by SHOPCO that he could rely on an a person. Okay, so puffery and prediction, basically. Indeed, exactly. What about the more specific representations about the—I don't know if it was the optometry branch or whatever? Yeah, so those are also puffery, Your Honor, and those also go to a second—they fail for a second element of fraud, which is that they must be false when made. That statement, he has not plausibly pled that was false, because just because a division or specific divisions of a company were doing well, that doesn't mean that just because the entity went bankrupt months later, at the time that those statements were made, those statements were false. So those are not actionable. And then finally, Your Honors— It does mean—I mean—well, go ahead. No, no, no, no, I got it. I got it. I'm good. Okay, but they argue something more than that. They argue that the whole propping up of the loan was designed just to dupe them into buying the property so that they could unload it, and it was just a temporary thing. It wasn't a regular business loan that you would just—that was making money and it was a good idea only because it was going to prop up that tenant long enough to get that property sold and get some value for the property. So it was a scheme to begin with. So it's more than just, did you know that they're having financial trouble? It's that they knew that they were having financial trouble but were choosing to try to over in order so that they could have a financial benefit. So it's a—I don't understand why that's not a perfectly viable scheme of fraud. If I may answer Your Honors' question. My time is up, but if I may. Your Honor, without alleging when that loan was made, it is conclusory to—and you have to assume that there was some nefarious purpose behind that loan because he only alleges that it was done at some point before the transactions, but that could have been a year ago, two years ago, five years ago. We need to get—I mean, you have to have discovery. It's a theory that needs discovery that is only in the possession of your client, whether or not they made the loan specifically to prop it up so that they can unload the property. It's a theory that's explained. No, I'm sorry. Did you have anything else? My time is up. If I—I can keep responding, but it's okay. Thank you, Your Honor. Good afternoon, Your Honors. May it please the Court. Rich Phillips here on behalf of the appellee Spirit Realty Capital, or SRC, as it's been referred to. I want to start by saying, as we did in our brief, we adopt the arguments that have been made by the other two appellees. I think there's a couple of clarifying things I can add there and then want to talk about a couple of issues that are specific to my client. First, on the issue of the fraud and the nondisclosure in their knowledge, I think there is a plausibility problem with their approach. The idea that someone would lend somebody $35 million if they know they're going bankrupt doesn't make any sense. The idea that you would spend $35 million to prop up the company to sell two properties for an alleged amount that totals about $12 million or a little more also doesn't make any sense. So I think there's a plausibility problem with their argument. Is that really something we could rule on at a 12B6? As the Supreme Court held in Twombly and Iqbal, they have to plead a set of facts that can plausibly support a claim. I just think they're not plausible here at this stage. I think that's what Judge Starr found. Did he do that? He didn't analyze that, though. He may not have gotten into that yet. No, he didn't. And I think the other thing I'd say on that issue is, and it's important here, if we look in other contexts of fraud, say in a securities fraud case and somebody signed a 10K, you have to allege that the person that signed that 10K knew it was false. And you have to allege how. And they haven't alleged that. And one thing I want to be clear of, Judge Elrod, you talked about managing agent for all these properties. This, again, is the reason why we need to very carefully read this complaint, because there are things in the brief and things that are said that try to kind of muddy the waters and elide over what is there and what is not. They do not allege that Mr. Carter was managing agent for all of the shop co-entities. He was managing agent for these two single-purpose entities that own two properties. That's the extent of the allegation. But I was reading from the complaint. It does say managing agent, but not for ShopCo, not for the entirety of ShopCo. It doesn't say that he is the manager of the entire ShopCo relationship. But then it says he has an email that says he was handling other ShopCo. If you have to pause two seconds. He had some. He was a vice president of my client, SRC. But there's no allegation that he knew about all of ShopCo as a candidate. Mr. Carter's email admits that SRC owns and controls all 2,600 ShopCo properties without regard to what specific entity name appears on title. SRC. Again, not him. The fact that he's a vice president of SRC doesn't mean that he has that knowledge, doesn't mean that he has information about all 2,600 properties. He's saying that SRC has 2,600 properties. So I don't think he alleges that, and I think there's a plausibility problem there. I also wanted to turn quickly to one other alternative ground on which the court can affirm, and that is the disclaimer of reliance that's in the contracts. It is very clear. And this is in the other appellee's brief at page 44, that the agreements provided that they were not, I'm sorry, page 43, had not been induced by, has not relied upon any statements, representation, or agreement, whether expressed or implied, not specifically set forth in this agreement. Sorry, what section of the agreement are you reading? This is section 6.01. Okay, hold on, hold on, because I've got that here. The miracle of computers, man. All right, go ahead. Yes, as is SAIL article 6. And then specifically, and this is important for language of the Texas Supreme Court about these disclaimers of reliance, specifically disclaims reliance on any statements, representations, agreements, whether expressed or implied, not specifically set forth in this agreement. The only answer that you'll see to that from the appellant is their argument that that's limited to the property. And they mean that means, they say that means the real estate. Okay, well, I do see property, and it's capitalized. Yes, so if you look at the definition of property. Where is that? Back at the beginning of the contract, property is specifically declined or defined to include the leases. 1.01. Correct. And if you look at 1.01, there's a long list of things that they're selling right title and interest to. The real property is A, sub B, the fixtures, sub C, all leases and rental agreements related to the real property. Where you're going, I think, is all of the foregoing in clause A through C are collectively property. Correct. Okay, so you're saying that the as-is clause pertains to representations regarding the property, which would include the leases. Correct. What's your best case under Texas law? That would be the Schlumberger case, Forest Oil. They rely on Italian Cowboy. In Italian Cowboy, I can tell you that the language there was about disclaiming the existence of statements. The reason that that case, the court found no disclaimer that could be enforceable is because it didn't disclaim reliance. It disclaimed the existence. I didn't understand the Formosa point here. If it is a fraud and inducement, that deals with the damages. It doesn't deal with that they can't say a claim. I agree, but frankly, I'm not sure on the Formosa point either. I think the key thing here is Schlumberger and Forest Oil because they disclaimed it, and Schlumberger says it. And I think it's important to distinguish Italian Cowboy because Italian Cowboy did not have the word reliance in it. That was one of my cases. I'm still a little bitter about the fact that we lost, but that was what the Supreme Court said. And here, the word reliance is there. It says we did not rely on anything anybody said to us about the property, and I think that's an important issue. Italian Cowboy has confounded a number of people for many years. I'm with you. We must follow Texas law fully, all of their cases, whenever we're dealing with them. And I think that one does support us on this one. My time is now gone. I didn't get to talk about my specific SRC issues. We have briefed them. I think it's important. If I might indulge for 30 seconds. Thank you. I'll be very quick. The first one is the contract claim. SRC is not a party to the contract. There's no allegation that they were. The claim, regardless of what happens, that claim cannot come back against my client. And additionally, the Alter Ego claims. The reason that Judge Starr didn't go with the contract claim is because they hadn't adequately alleged Alter Ego. They still haven't done so. And so for those independent reasons, and also I think there's some stuff in our briefing, there's no basis for a duty independent on SRC to disclose anything. No specific allegations beyond what Mr. Carter said. And there's some questions about who he's working for, but I don't think they've alleged enough to say those were statements by SRC versus the other two entities. So I think those are independent grounds. But I think the main ground you ought to focus on, aside from the 9B stuff, which we think is adequate to affirm it, is the fact that they disclaimed all of this. Okay. Thank you. Thank you. Mr. Vivaldi, I want you to make whatever points you want, but I hope you get to the disclaimer of Reliance Point Section 6.01. Number two on my list. Oh, good. Of three. Excellent. Mr. Carter, both contracts identified him as the representative on behalf of these selling entities. We have Mr. Carter's- Contracts themselves. Yes, sir. We have Mr. Carter's email attached as Exhibit 3. And I thought it was almost comical in their brief. They cut and pasted the email, but left out the footer, which had his Spirit Realty Corporation title at the bottom. So he had control of all of these. He admits as much. He says in Exhibit 3, we control all 2,600 properties, including on Alaska. That's one of these two that was actually purchased by my client. So, and by the way, Judge Starr did not say that there's no alter ego because it wasn't adequately pled. He said that he didn't find sufficient basis for a fraud claim. Therefore, he wasn't going to apply alter ego. We absolutely sufficiently alleged alter ego, and the dominion and control could not be clearer. And it's admitted by Mr. Carter's email. Disclaimer 6.01 creates nothing more than maybe a factual dispute to be resolved at trial. They're going to certainly point to that and say, Mr. Afshan, you certainly should have by virtue of this statement, buried in a lengthy paragraph that just says, I think it says finance or income is the only statement or comment that's in that entire paragraph. You know, as I heard the argument, I thought of the old Crocodile Dundee movie. That's not a knife. This is a knife. You want to see a disclaimer? It's Exhibit 4 to the complaint. The disclaimer that they draft. My clerks have heard of that movie, so that's not useful. Sorry. Well, wouldn't someone say that the, someone might say the applicability of a disclaimer is a legal issue that can be decided on the pleadings? Well, what Italian Cowboy says is a release can waive claims for fraud if it clearly expresses the party's intent to waive fraudulent inducement claims. And you're saying that's not a clear waiver? Absolutely not. That is absolutely not. It wouldn't have to be in the typeface or anything. This is not that kind of waiver, though, right? It would have to be somewhat clear. Yes. And some language reflecting that my client is disclaiming or waiving claims for fraudulent inducement, which is what the Italian Cowboy talked about. There's nothing like that here. What's your three? Three. Oh. You had three points. That was your second point. The long. I have a question. The long. What the complaint specifically alleges is, number one, they did prop up the tenant because they wanted to just get rid of these properties before the tenant went under. We specifically allege that by virtue of the loan that was in place, they were receiving non-public financial information about this tenant, concerning which my client had absolutely no way to obtain. You know, I hear these arguments. We're talking about on the pleadings. No opportunity to conduct discovery. Why would they do that? Why is it plausible? Why is which plausible? Why would you loan someone that much money when the properties themselves are not worth that much money? Well, number one, there's 2600 different properties. There's a revenue stream that's coming in on the leases. There's a desire to keep this tenant in place. I don't pretend to know yet because I haven't seen the documents. I haven't seen the documents that upon which they base the decision to lend. I haven't seen any internal communications at Spirit Realty Corporation saying, hey, maybe we ought to do this so we can at least get rid of some of these properties so we're not in a 2008, 2009 end of the world scenario where property values go upside down. I don't know. We don't have that discovery. What we do have and what we have adequately alleged is that they had specific financial information, knowledge about this tenant's sinking financial condition that they didn't disclose and instead made contrary representations intended to assure my client that all would be well and this tenant would be perfectly fine. This is not a case that can be disposed on the platings. It just plain can't. So unless there's any other questions, I do appreciate, again, and it's been a privilege to appear before you. Thank you. Certainly for the longest I've traveled. I apologize for the fog. No problem. Thank you. Thank you very much. This being the only case for argument this afternoon and today, we'll adjourn until 1 p.m. tomorrow.